# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

NORFOLK SOUTHERN RAILWAY CO., )
                                           )
                 Plaintiff, )
                                           )
   v.                                   )    Case No. 06 C 0641
                                           )
CHARLES E. BOX, et al., in their official    )    Judge Virginia M. Kendall
capacities as Commissioners of the Illinois   )
Commerce Commission,                )
                                           )
                 Defendants.    )

## MEMORANDUM OPINION AND ORDER

The Illinois Commerce Commission adopted a regulation requiring rail carriers to provide walkways adjacent to yard tracks constructed or reconstructed after February 15, 2005 ("the State Rule"). Plaintiff Norfolk Southern Railway Co. ("Plaintiff" or "Norfolk Southern") seeks a declaration that this regulation is preempted by regulations promulgated pursuant to the Federal Railway Safety Act ("FRSA") ("the Federal Rules"). Plaintiff also asks this Court to enjoin the State permanently from enforcing its walkway regulation.

Norfolk Southern has moved for summary judgment on its claims. Because the Federal Rules do not cover the same subject matter as the State Rule, the State Rule is not expressly preempted under the FRSA. Additionally, genuine issues of material fact exist as to whether the State Rule will either make it impossible for Plaintiff to comply with federal requirements for track safety and structure or stand as an obstacle to the accomplishment of the full purposes of those requirements. These disputed issues of fact preclude judgment as a matter of law on whether the State Rule is impliedly preempted because it conflicts with the Federal Rules.

## General Background

Norfolk Southern is a rail carrier operating throughout the Eastern and Central United States. (SOF ¶ 1.) Charles Box and the other defendants are Commissioners of the Illinois Commerce Commission ("ICC"). (SOF ¶ 2.) The ICC has exclusive jurisdiction over rail carrier operations within the State of Illinois, except to the extent preempted by valid federal statute, regulation or order. 625 ILCS § 5/18c-7101.

On February 12, 2003, the United Transportation Union petitioned the ICC to adopt a rule mandating that walkways be placed adjacent to tracks in Illinois. (SOF ¶ 32.) On October 2, 2003, an ICC Administrative Law Judge held an evidentiary hearing on the Union's proposed rule. (Answer ¶ 34.) The ALJ then issued a proposed order on January 7, 2004, concluding that the walkway rule was "not in the best interest of railroad safety" and would result in railroad tracks "which will not conform to FRA standards for track support." (SOF ¶ 33); (Answer ¶¶ 31-38.) Before the ICC adopted or rejected the ALJ's proposed order, the General Assembly passed Public Act 093-0791. (Answer ¶ 39.) The Act, which became effective on July 22, 2004, stated that "the [ICC] shall adopt rules requiring safe walkways for railroad workers in areas where work is regularly performed on the ground." Public Act 093-0791. The Act further provided that the "rules must include, at a minimum, a requirement that any walkway (i) have a reasonably uniform surface, (ii) be maintained in a safe condition, and (iii) be reasonably free of obstacles, debris, and other hazards." *Id.* Pursuant to this mandate, the ICC adopted a requirement "that rail carriers must provide walkways adjacent to those portions of yard tracks constructed after February 15, 2005 where rail carrier employees frequently work on the ground performing switching activities." 92 Ill. Admin. Code 1546.10. The State Rule also set general requirements for the design and construction

of the walkways. *See* 92 Ill. Admin. Code 1546.20; 1546.110; 1546.120.

The rails of a track sit on a roadbed. (SOF ¶ 7.) The roadbed is built from the ground up, starting with the subgrade (soil and other naturally occurring materials). (*Id.*) A layer of subballast (crushed rocks) is added to the subgrade. (*Id.*) A ballast layer is then added to the subballast. (*Id.*) Ballast typically is comprised of rocks, the size of which will depend on the type of track. (SOF ¶ 10.) The purpose of the track support, and the ballast in particular, is to keep the ties and rails in place. (SOF ¶¶ 8, 11.)

Proper drainage is a key element of track support and the safe operation of the railroad. (SOF ¶ 12.) In order to provide adequate track support, the ballast must drain water from the track structure. (SOF ¶ 14.) The size of the ballast directly affects the space available for the passage of water through the ballast section. (SOF ¶ 19.) The larger the ballast, the larger the space between individual pieces of ballast. (*Id.*) The size of the ballast needed to facilitate proper drainage varies based on the usage of the track. (SOF ¶ 21.) Water that cannot drain from the track structure will mix with soil in the subgrade to form mud. (SOF ¶ 15.) The muddy ballast further restricts draining of the ballast section. (SOF ¶ 15.)

Norfolk Southern's trains run on both mainline and yard tracks. (SOF ¶ 37.) Mainline tracks are stand-alone tracks over which trains move at high speeds. (SOF ¶ 37.) Yard tracks are those non-mainline tracks in railyards that are used to perform switching, maintenance, and certain other operations. (SOF ¶ 37.) Switching operations also occur on Norfolk Southern's mainline tracks. (SOF ¶¶ 44-45.)

### Standard of Review

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories,

3

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of fact exists, a court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986). A court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. Of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. *See Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted."). An adequate rebuttal requires a citation to specific support in the record, an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001).

Plaintiff asks this Court to "ignore any evidence not set forth by Defendants in a separately filed Local Rule 56.1(b)(3)(B) statement of additional facts." Local Rule 56.1(b)(3)(B) requires a party opposing summary judgment to file "a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific reference to the affidavits, parts of the record, and other supporting materials relied upon." Defendants appear to have done just as Local Rule 56.1(b)(3)(B) requires. Perhaps, Plaintiff is asserting that the information should have been presented under Rule 56.1(b)(3)(C) which requires "a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references

to the affidavits, parts of the record, and other supporting materials relied upon." In any respect, Defendants have complied with the key component of Local Rule 56.1 in that they included specific references to the evidence in the record that support their response to Plaintiff's Statement of Material Facts. Plaintiff also states that Defendants failed to put in the record the declaration from Mr. Sullivan and the deposition of Jeff McCracken. The Court received a copy of these materials on December 5, 2005 along with Defendants' Opposition. As such, all of Defendants' evidence is properly before the Court and has been considered.

## DISCUSSION

The Supreme Clause of the United States Constitution states: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the Supreme Law of the land." U.S. Const., art. VI, cl. 2. Under the Supremacy Clause, federal law preempts state law in three circumstances: (1) when Congress explicitly defines the extent to which its statute preempts state law ("express preemption"); (2) when state law attempts to regulate conduct in a field that Congress intended the federal government to occupy exclusively ("field preemption"); or (3) when state law actually conflicts with federal law ("conflict preemption"). *See English v. General Elec. Co.*, 496 U.S. 72, 78-79 (1990); *Gracia v. Volvo Europa Truck, N.V.*, 112 F.3d 291, 294-295 (7th Cir. 1997). With any preemption "the ultimate touchstone" is congressional purpose. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).

The party advocating preemption bears the burden of proof. *See Fifth Third Bank ex rel. Trust Officer v. CSX Corp.*, 415 F.3d 741, 745 (7th Cir. 2005). Norfolk Southern argues that the State Rule regarding walkways is expressly preempted because the FRA has prescribed regulations covering this same subject matter, specifically, the area of track support and trackside material.

Plaintiff additionally argues that the State Rule is preempted because it conflicts with the federal regulations by preventing proper drainage and track stability and eliminating engineering flexibility to address such track safety issues.

## I.    Express Preemption

"Express preemption occurs when a federal statute explicitly states that it overrides state or local law." *Hoagland v. Town of Clear Lake, Ind.*, 415 F.3d 693, 696-97 (7th Cir. 2005). Section 434 of the FRSA evinces congressional intent to preempt "at least some state law," but this Court is still required to "identify the domain expressly pre-empted by that language." *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 484 (1996) (citation and internal quotation marks omitted); *English v. General Elec. Co.*, 496 U.S. 72, 78-79 (1990) ("Congress can define explicitly the extent to which its enactments pre-empt state law"). This Court begin its analysis with the plain wording of the express preemption clause because it is that wording which best reflects Congress' intent. *See CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993) ("If the statute contains an express pre-emption clause, the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent").

Congress enacted the Federal Rail Safety Act ("FRSA") in 1970 "to promote safety in every area of railroad operations and to reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. To achieve this goal, Congress gave the Secretary of Transportation broad authority "to prescribe regulations and issue orders for every area of railroad safety." 49 U.S.C. § 20103. The Secretary of Transportation, in turn, delegated this authority to the FRA. *See Mich S. R.R. Co. v. City of Kendallville*, 251 F.3d 1152, 1154 (7th Cir. 2001) ("Regulations [under the FRSA] are promulgated and enforced by the Federal Railway Administration"). Section 434 of the FRSA, the

statute's preemption clause, provides that a state law, regulation or order related to railroad safety may continue in force "until such time as the [FRA] has adopted a rule, regulation, order, or standard covering the subject matter of such State requirement."[1] 49 U.S.C. § 20106; *see Shots v. CSX Transp., Inc.*, 38 F.3d 304, 307 (7th Cir. 1994) ("If the Secretary promulgates a regulation that covers the subject matter of some state safety requirement, the state requirement must give way (with an inapplicable exception) even if there is no direct conflict"). A State may add to the federal requirements on a subject matter only when it "is necessary to eliminate or reduce an essentially local safety or security hazard," is not incompatible with any other federal law, regulation, or order, and "does not unreasonably burden interstate commerce." 49 U.S.C. § 20106. Thus, although the FRA provides that railroad safety standards shall be nationally uniform to the extent practicable, it permits states to regulate in two circumstances: (1) when there is no federal regulation "covering" the subject matter, and (2) when it is necessary to eliminate or reduce an essentially local safety hazard. *See Easterwood*, 507 U.S. at 665 ("The term 'covering' is in turn employed within a provision that displays considerable solicitude for state law in that its express pre-emption clause is both prefaced and succeeded by express saving clauses"). Defendants do not contend that the State Rule addresses

---

[1] Laws, regulations, and orders related to railroad safety and laws, regulations, and orders related to railroad security shall be nationally uniform to the extent practicable. A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), prescribes a regulation or issues an order covering the subject matter of the State requirement. A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation, or order–

**(1)** is necessary to eliminate or reduce an essentially local safety or security hazard;
**(2)** is not incompatible with a law, regulation, or order of the United States Government; and
**(3)** does not unreasonably burden interstate commerce.

49 U.S.C. § 20106.

a local safety hazard.[2]  Accordingly, the question of express preemption turns on whether federal regulations cover the same subject matter as the State Rule.

### A.     The State Rule

The State Rule has four sections.  The first section defines the Rule's scope.  It provides that rail carriers must create walkways adjacent to those portions of yard tracks, constructed or reconstructed after February 15, 2005, where rail carrier employees frequently work on the ground performing switching activities.  *See* 92 Ill. Admin. Code 1546.10(a)-(b).  The second section lists the general requirements for the walkways.  *See* 92 Ill. Admin. Code 1546.20.  The first requirement is that the walkways be surfaced with asphalt, concrete, planking, grating, native material, crushed material, or other similar material.  *See* 92 Ill. Admin. Code 1546.20(a).  When crushed material is used for the walkways, the State Rule provides that "100% of the material must be capable of passing through a 1 1/2" square sieve opening and 90-100% of the material must be capable of passing through a 1" square sieve opening."  *Id.*  Other general requirements include that the walkways must have a reasonably uniform surface, be maintained in a safe condition without compromising track drainage, have cross slopes not exceeding 1" of elevation for each 8" of horizontal length in any direction, and be a minimum width of 2 feet and be kept reasonably free of spilled fuel oil, sand, posts, rocks, and other hazards or obstructions.  *See* 92 Ill. Admin. Code 1546.20(b)-(e).  The third section repeats that the State Rule applies only to "New Yard Tracks" – those constructed or reconstructed after February 15, 2005 – and defines "frequently" for purposes of the Rule as at least 5 days per week, 1 shift per day.  *See* 92 Ill. Admin. Code 1546.110(a)-(b).

_____

[2] The question of whether the State Rule will unreasonably burden interstate commerce consequently becomes irrelevant since it arises for purposes of express preemption under the FRSA only when a State seeks to regulate a subject matter covered by federal law.

The last section addresses when walkways may be required on "Other Tracks." *See* 92 Ill. Admin. Code 1546.120(a). The last section allows the ICC to order the construction of a walkway on "other tracks" when "rail carrier employees who frequently work adjacent to a portion of track performing switching activities are exposed to safety hazards because of the lack of a walkway." *Id.* The parties disagree as to what the term "other tracks" refers. Plaintiff contends that the last section extends the requirements of the State Rule beyond the railroad yard to mainline track on which switching activities are frequently performed. Plaintiff thus reads "other" as tracks other than tracks in railroad yards. Defendants read "other" as yard tracks other than those portions of yard tracks constructed after February 15, 2005. The Court agrees with Defendants' reading. The previous (third) section is titled "New Yard Tracks" and limits the State Rule's scope to *yard* tracks *constructed after February 15, 2005*. *See* 92 Ill. Admin. Code 1546.110. The title of the State Rule is "Employee Walkways *in Railroad Yards*." It is therefore reasonable to read "Other Tracks" as "Old Yard Tracks." Read in this way, the other tracks' exception allows the ICC to require walkways when it identifies a specific safety hazard caused by the lack of a walkway along yard tracks constructed before February 15, 2005, and it does not allows the ICC to order walkways be constructed along mainline tracks.

As to the subject matter of the State Rule, its title pretty much says it all – "Employee Walkways in Railroad Yards." The State Rule was passed to protect rail carrier employees from being exposed to safety hazards while performing their duties alongside railyard tracks. 92 Ill. Admin. Code. 1546.120(a). The State Rule addressed this safety concern by requiring that rail carriers provide walkways adjacent to those portions of yard tracks where rail carrier employees frequently work on the ground performing switching activities. The Court thus turns to whether any

federal law, regulation or order covers this same subject matter.

**B.     The Federal Rules**

Pursuant to its delegated authority, the FRA adopted a set of "Track Safety Standards." *See* 49 C.F.R. §§ 213.1-213.241; § 213.1 ("This part prescribes minimum safety requirements for railroad track that is part of the general railroad system of transportation").  Broadly speaking, the safety standards deal with such issues as train speed (§ 213.9), track repair, maintenance and inspection (§§ 213.11, 213.231), roadbeds (§ 213.31), track geometry (§ 213.51) and track structure (§ 213.101).  Defendant asserts that the regulations dealing with roadbed and track structure cover the same subject matter as the State Rule.

Subpart B of the Track Safety Standards "prescribes minimum requirements for roadbed and areas immediately adjacent to roadbed."  49 C.F.R. § 213.31.  Specifically, it requires that roadbeds must have adequate drainage[3] and that vegetation on railroad property must be controlled.[4]  Subpart D, titled Track Structure, "prescribes minimum requirements for ballast, crossties, track assembly

---

[3] Each drainage or other water carrying facility under or immediately adjacent to the roadbed shall be maintained and kept free of obstruction, to accommodate expected water flow for the area concerned.
49 C.F.R. § 213.33.

[4] Vegetation on railroad property which is on or immediately adjacent to roadbed shall be controlled so that it does not--
(a) Become a fire hazard to track-carrying structures;
(b) Obstruct visibility of railroad signs and signals:
    (1) Along the right-of-way, and
    (2) At highway-rail crossings;
(c) Interfere with railroad employees performing normal trackside duties;
(d) Prevent proper functioning of signal and communication lines; or
(e) Prevent railroad employees from visually inspecting moving equipment from their normal duty stations.
49 C.F.R. § 213.37.

fittings, and the physical conditions of rails." 49 C.F.R. § 213.101. With regards to ballast, the Federal Rules require that it: (i) transmit and distribute the load of the track, (ii) restrain the track, (iii) provide adequate drainage, and (iv) maintain proper track crosslevel, surface, and alinement. *See* 49 C.F.R. § 213.103.

## 1.    FRA Regulation of Employee Safety

In addition to the track safety regulations, Defendant points to a FRA policy statement issued in 1978 wherein the FRA asserted that OSHA ("Occupational Safety and Health Administration") regulations would not apply to walkways because walkways "are so much a part of the operating environment that they must be regulated by the agency with primary responsibility for railroad safety." 43 Fed. Reg. 10,587. The FRA stated further that it would "determine the need for and feasibility of general standards to address individual hazards related to such surfaces." *Id.* Even prior to 1978 though, the FRA looked at the issue of employee safety near tracks during its proposed rule-making procedures. First, in 1971, the FRA proposed to adopt § 213.39 as part of its track safety standards: "If an object or hazardous condition within 10 feet of the center line of track impedes the safe passage of equipment or prevents railroad employees from safely performing their duties, the owner of the track shall remove the object or correct the hazardous condition or give appropriate warning notification." 36 Fed. Reg. 11,976. After receiving comments regarding the proposed regulation, the FRA concluded that it should not be adopted, "because its language was . . . too vague to constitute an effective safety standard." 36 Fed. Reg. 20,336. Next, in 1975, the FRA proposed to adopt railroad occupational safety and health standards. 40 Fed. Reg. 10,693. The standards were to cover the roadway – track, roadbed, track appliances, and related devices, rolling stock, railroad yards and terminals, signal and communication devices and railroad support facilities.

*Id.* The FRA decided that it would issue its occupational safety and health regulations through a series of proposed rules, rather than in one giant undertaking. 41 Fed. Reg. 29,153-54. The first, and seemingly only, proposed rule contained standards governing means of egress from buildings and structures in case of emergency, general environmental controls and fire protection. *Id.* Finally, in 1976, the FRA solicited comments on whether it should adopt regulations requiring walkways on trestles and bridges. 41 Fed. Reg. 50,302. The FRA decided against such a regulation, finding that the costs of the regulation would outweigh the benefits of a nationwide requirement of walkways on those structures. 42 Fed. Reg. 22,184-85. The FRA concluded that "if an employee safety problem does exist because of the lack of walkways in a particular area or on a particular structure, regulation by a state agency that is in a better position to assess local need is the more appropriate response." *Id.*

### 2. Prior Caselaw on State Walkway Requirements

A number of courts have addressed the issue of whether federal regulation of roadbed, track structure and employee safety preempt state walkway requirements. Some of these courts held that state regulations covering walkways are preempted because walkways are an integral part of the track support and roadbed structure. *See, e.g., Norfolk and Western Ry. Co. v. Burns*, 587 F. Supp. 161, 169 (D. Mich. 1984) ("Insofar as rails and track surface, including cross ties and ballast and all adjacent switches and appurtenances are concerned, this court has no trouble in concluding that the federal regulations do treat this subject matter, that they treat it comprehensively, and that there has been a clear indication of an attempt to regulate in these areas in a manner which would preempt state regulation"); *Black v. Seaboard System R.R.*, 487 N.W.2d 468, 469 (Ind. Ct. App. 1986) ("Although unsafe walkways have not been the subject of specific federal regulations . . . [w]alkways

are a part of the track structure and rail system that in general present an area preempted by the [FRA]").  Other courts did not read the track safety standards so broadly.   These courts found against preemption because neither the track support or roadbed regulations nor any other FRA regulatory action dealt with the issue of employee safety near railroad tracks.  *See, e.g., Grimes v. Norfolk Southern Ry. Co.*, 116 F. Supp. 2d 995, 1002-03 (N.D. Ind. 2000) ("The regulations are directed toward creating a safe roadbed for trains, not a safe walkway for railroad employees who must inspect the trains"); *Elston v. Union Pacific R. Co.*, 74 P.3d 478, 488 (Colo. App. 2003) ("These standards are directed at promoting a safe roadbed for trains, but offer no indication whether a railroad has a duty to provide safe walkways for employees alongside its tracks"); *Southern Pac. Transp. Co. v. Pub. Util. Com'n of State of Cal.*, 647 F. Supp. 1220, 1226 (N.D. Cal. 1986), *aff'd Southern Pacific Transp. Co. v. Public Utilities Com'n of State of Cal.*, 820 F.2d 1111 (9th Cir. 1987); *Illinois Cent. Gulf R. Co. v. Tennessee Public Service Com'n* ,736 S.W.2d 112, 116 (Tenn. App. 1987).

The Fifth Circuit took a separate approach to the issue.  The Court rejected the notion that federal track safety regulations necessarily preempted a state walkway requirement, but found that a walkway requirement would cover the same subject matter "if, from a practical standpoint, the width, surface and slope requirements of the state walkway regulation generally add to the FRA standards by requiring the railroad to strengthen or enlarge the roadbed beyond FRA requirements." *Missouri Pacific R. Co. v. Railroad Com'n of Texas*, 833 F.2d 570, 575-76 (5th Cir. 1987) ("*Mopac I*").  The Fifth Circuit, as has every court, also rejected the argument that the FRA's 1978 Policy Statement or any other rulemaking action outside of the track safety standards preempted state regulation of walkways.  *See, e.g., Mopac I*, 833 F.2d at 576; *Southern Pac. Transp. Co.*, 647 F.

Supp. at 1225; *Norfolk and Western Ry. Co.*, 587 F. Supp. at 169.

### 3.      Coverage of the Federal Rules

Determining whether federal regulations cover a particular subject matter is a difficult and uncertain task. *Accord Union Pac. R.R. Co. v. California Pub. Util. Comm.*, 346 F.3d 951, 864 (9th Cir. 2003) ("The standard for 'covering' under the FRSA is not easy"). For federal regulations to "cover" the same subject matter, they must do more than "touch upon" or "relate to" the state regulation's subject matter. *Id.* Instead, "preemption will lie only if the federal regulations substantially subsume the subject matter of the relevant state law." *Id.* In determining the subject matter covered by federal law a court must examine not just one particular regulation but all "related safety regulations" and "the context of the overall structure of the regulations." *Id.*; *see Burlington Northern and Santa Fe Ry. Co. v. Doyle*, 186 F.3d 790, 797 (7th Cir. 1999) ("[A]s *Easterwood* teaches, we have to examine all related regulations and orders to see if the FRA has determined [the issue]"). Plaintiff argues that the State Rule is preempted based upon: (1) the FRA's prior regulation of employee safety and walkways, and (2) the fact that the overall structure of the track safety regulations cover the same subject matter as the State Rule, specifically, track support and trackside material.

In *Easterwood*, the Supreme Court addressed the extent to which the FRSA preempted a Georgia law for operating a train at an excessive speed. *Id.* at 661. Section 213.9(a) of the FRSA set maximum allowable operating speeds for freight and passenger trains depending on the class of track on which they traveled. The plaintiff contended that the speed limits should be read as a ceiling for a train's speed but should not preclude further state regulation addressing the specific hazards caused by track conditions such as grade crossings. *Id.* at 674-75. In response, the Court

noted that related regulations focused on giving appropriate warnings at grade crossings given variations in train speed. *Id.* at 674. These regulations required the installation of signaling devices and automatic gates to ensure safety at grade crossings. *Id.* Thus, when placed within the overall structure of the regulations, the Court found that "the speed limits must be read as not only establishing a ceiling, but also precluding additional state regulation." *Id.* at 674.

The FRA has never exercised this jurisdiction to regulate walkways or employee safety in the areas immediately adjacent to railroad tracks. By adopting the its 1978 Policy Statement, the FRA sought to assert its jurisdiction over employee safety in railroad surfaces to the exclusion of OSHA, not necessarily to limit the states' ability to also regulate. *See Southern Pacific Transp. Co.*, 647 F. Supp. at 1226 ("[T]he Policy Statement attempted to delineate the respective jurisdictions of the FRA and OSHA. It did not purport to limit state jurisdiction"); *Norfolk and Western Ry. Co.*, 587 F. Supp. at 169 ("The court finds this statement by the federal agency itself to be extremely persuasive of the fact that there is a clear recognition that there is a role for the states to play in this regulatory scheme").

Section 434 of the FRSA permits state action in the face of federal inaction. *See Union Pacific R. Co. v. California Public Utilities Com'n*, 346 F.3d 851, 868 (9th Cir. 2003) ("Because the FRA merely deferred making a rule, rather than determining that no regulation was necessary, the state can legitimately seek to fill this gap"); *Doyle*, 186 F.3d at 801 ("When the FRA examines a safety concern regarding an activity and affirmatively decides that no regulation is needed, this has the effect of being an order that the activity is permitted"). For example, in *Doyle*, a Wisconsin regulation required that at least two crew members be on a train when it was moving. *Doyle*, 186 F.3d at 796-804. The regulation applied to three types of one-person crew operations: hostling

movements, helper movements, and over-the-road movements. *See id.* at 801. The Wisconsin regulation was found preempted as to one-person crews for hostling and helper operations because the FRA had considered and determined safety issues related to having one-person crews perform each of these operations. *Id.* Instead of requiring multiple person crews, the FRA enacted a regulation permitting a lone engineer, but only if certain condition were met. *Id.* at 799. As to over-the-road operations, the railroad had argued that because the FRA was aware of the safety concern but had not acted, the FRA must approve of the operations as safe. *Id.* at 802. Yet, the Court held that because the FRA was still studying the issue, the FRA's consideration of one-person crews for over-the-road operations had not "taken on the character of an affirmative decision to do nothing," and Wisconsin was free to require two-person crews for over-the-road operations. *Id.* at 802.

The FRA has not made an affirmative determination that walkways should not be permitted in the area adjacent to railroad tracks nor has it determined that the concern for employee safety in that area can be better regulated in a different manner.[5] *See Dowe v. Nat'l R.R. Passenger Corp.*, 2004 WL 887410, *5 (N.D. Ill. 2004) (FRA's regulatory determination to leave specifics of training programs to railroads preempted state regulation of training programs); *In re Derailment Cases*, 416 F.3d 787 (8th Cir. 2005) (preemption applied to a negligent inspection claim when the safety issues

---

[5] Phil Olekszyk, former FRA Deputy Associate Administrator for Safety, testified that during his tenure, the FRA delivered a consistent message that the track safety standards preempted state rules with regard walkways. (Olekszyk Dep. at 59-60.) He also testified that the FRA often responds to complaints from railroad workers about walkway conditions. (*Id.* at 100-05.) Given the absence of formal decisionmaking by the FRA on the issue and the lack of any guidelines for compliance, Olekszyk's testimony does not show that the FRA had completed the decisionmaking process and that it's position on walkways was "absolutely clear." *Atchison, Topeka & S. F. R.R. v. Pena*, 44 F.3d 437, 441 (7th Cir. 1994) (*en banc*), *aff'd. sub nom. Brotherhood of Locomotive Engineers v. Atchison, T. & S. F.R.R.*, 516 U.S. 152 (1996) (not addressing issue of "final agency action"); *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992). Consequently, the FRA's actions do not constitute a regulation or order as needed to preempt a state regulation under § 434.

giving rise to that claim were addressed in federal regulations); *CSX Trans., Inc. v. Williams*, 406 F.3d 667, 671-72 (D.C. Cir. 2005) (state regulation preempted where DOT intentionally gave transporter flexibility to solve safety concern). The only statements from the FRA to date indicate a future intent to deal with the issues of walkways and employee safety in the area adjacent to railyard tracks. Even the 1977 order which declined to adopt a federal rule for bridge walkways appears to suggest that future regulation of the issue may be best addressed by the states. *See* 42 Fed. Reg. 22,185 ("[I]f an employee safety problem does exist because of the lack of walkways in a particular area or on a particular structure, regulation by a State agency that is in a better position to assess the local need is the more appropriate response"). As the Seventh Circuit instructed in *Doyle*, where the FRA has not "considered [the] subject matter and made a decision regarding it," a state can "fill gaps where the Secretary [of Transportation] has not yet regulated." *Doyle*, 186 F.3d at 795. Thus, unless the FRA track structure and roadbed regulations cover the subject, the State Rule is not preempted. *See Mopac I*, 833 F.2d at 576 ("[T]he FRA's statement implies that unless walkway regulations are otherwise preempted, *e.g.*, by FRA track and roadbed regulations that 'cover the subject matter,' § 434 could authorize state regulation until the FRA acts"). Therefore, the Court turns its attention to the subject matter of the regulation.

Sections 213.31 and 213.101 of the Federal Rules prescribe minimum requirements for roadbed and areas immediately adjacent to roadbed and for track structure. The Seventh Circuit has stated that "the subject matter of the state requirement is the safety concerns that the state law addresses." *Doyle*, 186 F.3d at 796. The State Rule addresses safety concerns faced by rail carrier employees while they perform their duties along railyard tracks. None of the federal track safety regulations cover employee safety in the area adjacent to the tracks. As Plaintiff's evidence and

arguments indicate, the federal regulations are designed to ensure a stable track structure and safe roadbed for the train:

> The ballast regulations . . . are designed to insure that tracks have adequate support. The regulations dealing with vegetation on or near roadbeds are designed to insure that employees can perform necessary maintenance work. No FRA regulation addresses the concern that employees have a safe working environment near railroad tracks.

*Southern Pac. Transp. Co.*, 647 F. Supp. at 1225; *see Illinois Cent. Gulf R. Co.*, 736 S.W.2d at 116 ("[T]he subject matter of safe walkways has not been dealt with in the track safety standards"); *but see Pierce v. Chicago Rail Link, L.L.C.*, 2005 WL 599980, *12 (N.D. Ill. 2005) ("[C]ertain aspects of the regulations were created at least in part to protect railroad employees like [plaintiff] who perform trackside duties"). A certain tension arises in this case though between this "safety concern" approach and the Supreme Court's earlier admonition that "[s]ection 434 does not, however, call for an inquiry into the Secretary's purposes, but instead directs the courts to determine whether regulations have been adopted that in fact cover the subject matter of train speed." *Easterwood*, 507 U.S. at 675. *Easterwood* indicates that if federal regulations in fact covered the subject matter of walkways, the FRA's purposes in enacting them would be irrelevant. In spite of its admonition, the Court determined that the speed limits were set with safety concerns in mind and concluded that § 213.9 covered "the subject matter of train speed *with respect to track conditions, including the conditions posed by grade crossings.*" *Id.* (emphasis added); *see Waymire v. Norfolk and Western Ry. Co.*, 218 F.3d 773, 776 (7th Cir. 2000) (describing *Easterwood* as holding that "the preemption clause does not require an inspection of the regulation's motivation, and, even if it did, the structure of the regulations showed that they were adopted with safety in mind").

Assuming that this Court should not factor in the FRA's purpose, the question then becomes

whether the federal regulations *in fact* cover the subject matter of employee walkways in railyards. Plaintiff argues that walkways are effectively part of the track structure and roadbed and, therefore, a subject matter covered by federal regulation. A walkway is located near the ballast supporting the tracks and roadbed, is constructed of materials commonly used in track support and may affect the drainage or stability of the tracks and roadbed depending upon its location and design. *See Illinois Cent. Gulf R. Co.*, 736 S.W.2d at 116 ("Since walkways alongside the track are necessarily a part of the roadbed, and since a walkway touches and concerns ballast and crossties, it is possible to conclude that any federal regulation dealing with these subjects has preempted a state regulation concerning walkways"). Plaintiff also points to the fact that the typical design of Norfolk Southern's railyards would cause the walkways to be placed atop existing track structure. (Affidavit of Jeffrey A. McCracken ("McCracken Aff.") at ¶ 28.)

Sections 213.31 and 213.101 describe the scope of the regulations contained in subparts B and D, but critically do not themselves contain any prescriptions. *See Easterwood*, 507 U.S. at 669 (distinguishing federal regulations that are descriptive, which do not preempt state law, from those that are prescriptive, or that affirmatively require or allow certain safety measures, which preempt state law). The prescriptive regulations pertaining to roadbed involve adequate drainage and vegetation control. The track structure regulations prescribe standards separately for ballast, crossties, track assembly fittings, and the physical conditions of rails. *See* 49 C.F.R. §§ 213.103 - 213.143. The ballast regulation requires that the ballast used to support the track must transmit and distribute the load of the track, restrain the track, provide adequate drainage and maintain proper track crosslevel, surface, and alinement. *See* 49 C.F.R. § 213.103. Employee walkways are not among the matters that the FRA considered or decided in setting the minimum requirements for track

structure and roadbeds.  *See Doyle*, 186 F.3d at 795 ("For preemption, the important thing is that the

FRA considered a subject matter and made a decision regarding it").  And unlike *Easterwood*, there

is no indication that the roadbed requirements not only establish a floor, but also preclude additional

state regulation.  *Easterwood*, 507 U.S. at 674.  To conclude that the federal regulations substantially

subsume the State Rule because it may affect track structure and roadbed would ignore the relatively

narrow definition afforded the term "cover."[6]  *See Easterwood*, 507 U.S. at 665 (comparing "cover"

to terms used in other express preemption clauses); *Medtronic*, 518 U.S. at 485 (presumption against

preemption applies to determining the scope of express preemption clause).  At best, the federal

regulations "relate to" or "touch upon" the subject matter of the State Rule, a relationship not strong

enough to invoke the express preemption clause of the FRSA.  *See Easterwood*, 507 U.S. at 665.

Accordingly, any affect that the State Rule has on ballast or roadbed requirements is measured

properly through the actual conflict it creates with the federal regulations, not as evidence that it is

a subject matter covered by the Federal Rules.

## II.    Implied (Conflict) Preemption

State law is impliedly preempted to the extent that it actually conflicts with federal law.  State

law conflicts with federal law "when it is impossible to comply with both state and federal law" or

"where the state law stands as an obstacle to the accomplishment of the full purposes and objectives

of Congress."  *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984); *see also Freightliner

Corp. v. Myrick*, 514 U.S. 280, 289 ("At best, *Cipollone* [*Liggett Group, Inc.*, 505 U.S. 504 (1992)]

---

[6] It is not clear even whether the federal regulations would prohibit direct state regulation of subjects such as ballast size, which is not specified in 49 C.F.R. § 213.103, since §§ 213.31 and 213.101 "prescribe minimum requirements."  *See Norfolk Southern Railway Co. v. Shanklin*, 529 U.S. 344, 359 (2000) (Breyer J., concurring) ("[F]ederal *minimum* safety standards should not pre-empt [state law]").

supports an inference that an express pre-emption clause forecloses implied preemption; it does not establish a rule").  Congress passed the FRSA for the purpose of promoting rail safety and making laws, regulations and orders related to railroad safety "nationally uniform to the extent possible." 49 U.S.C. §§ 20101, 20106.  In terms of this case, a conflict exists if the State Rule prevents Norfolk Southern from complying with the drainage and track stability requirements of the Federal Rules or if the State Rule unduly restricts the manner in which Norfolk Southern can construct its railroad yards in compliance with the Federal Rules.  In reviewing the evidence, the Court does so in light of its finding that the State Rule applies only to newly constructed or reconstructed yard tracks and not mainline tracks.

Plaintiff submitted the reports of Dr. Donald Uzarski ("Uzarski") and Jeffrey McCracken ("McCracken") in support of its position that the State Rule affects proper drainage and track stability and eliminates the flexibility that is central to the Federal Rules.  Defendants submitted a report from Richard Inclima ("Inclima") in response.

McCracken serves as Norfolk Southern's Chief Engineer Line Maintenance West. (McCracken Aff. at ¶ 1.)  In that capacity, he oversees the construction, maintenance and operation of Norfolk Southern's railroads in fourteen states, including Illinois.  (*Id.*)  He has spent a total of 29 years working at various posts in the rail system.  (*Id.* at ¶ 2.)  McCracken's affidavit initially covers the track engineering basics discussed in this opinion's general background.  (*Id.* at ¶¶ 5-18.) McCracken then discusses the particular design used in Norfolk Southern's railroad yards.  A single Norfolk Southern railyard may have up to 50 tracks running parallel.  (*Id.* at ¶ 21.)  Norfolk Southern typically configures its yards so that the center lines of the parallel tracks are 14 feet apart.  (*Id.* at ¶ 22.)  And since the ties Norfolk Southern uses are 8 ½ feet long, there is 5 ½ feet between the ends

of the ties of parallel tracks. (*Id.*) Norfolk Southern routinely places 6 inches of ballast extending outward from and level with the ties in order to provide adequate track support. (*Id.* at ¶ 23.) For railyards, 9 inches of ballast is placed below the bottom of the ties. (*Id.*) Under this track configuration, the track structure extends 7 feet from the center line of each track and 2 feet and 9 inches from the ends of the ties, where the ballast meets the sloping ballast section of the parallel track at the subballast. (*Id.*) This configuration of ballast restrains yard tracks' ties and rail laterally, longitudinally, and vertically and facilitates proper drainage. (*Id.*) Under this configuration, the track structures of parallel tracks consume the entirety of the space between those tracks. (*Id.* at ¶ 27.) Any walkway adjacent to a railyard track would necessarily have to sit atop the track structure that is already regulated by the FRA. (*Id.* at ¶ 28.)

Additionally, the slope and ballast requirements of the State Rule will affect the drainage and stability of the tracks. (*Id.* at ¶¶ 29-30.) McCracken explained during his deposition the major concern he sees with the State Rule: "So therefore, the only way you could meet this two-foot level walkway with no more than eight-to-one slope is to fill the tracks in if they were level from the head of the tie to head of tie level across, so that you can have two feet, and that way, you would destroy your drainage, you would bury up all your drainage structures, and you could not comply unless you did this. . . . It could not exist without completely redoing the yard, lowering tracks, raising tracks, making major changes, so that it can exist under FRA." (Deposition of Jeffrey McCracken ("McCracken Dep.") at 71-72.)

Uzarski is a visiting lecturer in the Railroad Engineering Program at the University of Illinois Urbana-Champaign since 1994. (Report of Donald R. Uzarski ("Uzarski Rep.") at 2.) Uzarski led the railroad engineering asset management research program at the U.S. Army Construction

22

Engineering Research Laboratory for over twenty years before he retired in 2004. (*Id.*) Uzarski opines that the State Rule will have a profound effect on critical elements of track support such as drainage, lateral track stability and vertical track stability. (*Id.* at 4.) As to drainage, he first contends that "[p]utting a walkway of some type on top of or abutting that ballast (i.e. on top of the subballast) will likely act as a dam, reducing the amount of water that was previously capable of draining." (*Id.*) When questioned on the statement during his deposition, Uzarski answered that the dam problem would not result if the same size ballast were being used throughout the track structure and shoulder. (Deposition of Donald R. Uzarski ("Uzarski Dep.") at 77-82.) Uzarski also points out that drainage is negatively affected when smaller ballast is utilized because less water can pass between the smaller sized ballast and because the smaller ballast fouls more easily. (Uzarski Rep. at 4.); (*see* McCracken Aff., ¶ 2 ("In the railroad industry, when ballast becomes obstructed, it is said to have 'fouled.'")). The State Rule requires 100% of ballast to be less than 1 ½ inches square and at least 90 percent of the ballast to be less than 1 inch square. (*Id.*) According to McCracken, Norfolk Southern already uses 3/4 inch ballast in its railyards. (*Id.* at ¶ 18; McCracken Dep. at 68-69.) As such, the State Rule likely will not force Norfolk Southern to use smaller ballast in its railyards.

Drainage also is affected by the degree of slope of the roadbed. (Uzarski Rep. at 5.) The State Rule may require a different slope for the roadbed. (*Id.*) In his deposition, Uzarski could not say for certain though that the slope requirements of the State Rule would cause drainage problems in railyards. (Uzarski Dep. at 94.) He also stated that if most railyard tracks have a flat cross slope, the likely impact on drainage would be further diminished. (Uzarski Dep. at 92.) As to lateral and vertical track stability, Uzarski focuses on his premise that larger ballast is more stable. (Uzarski

Rep. at 6.)  When questioned, he could cite no studies proving larger ballast was more stable and could not say that the ballast required by the State Rule would create a safety hazard.  (Uzarski Dep. at 95-100.)

Finally, Uzarski states that the State Rule dramatically reduces the flexibility afforded to railroad engineers when they are designing and constructing track and roadbed.  (Uzarski Rep. at 7.)  In his deposition, Uzarski could not explain his related statement that the State Rule runs counter to good engineering practices.  (Uzarski Dep. at 104-06.)  Uzarski eventually acknowledged that "Oh, I think you can certainly design a safe rail yard, and you certainly can apply State Rule and have a safe rail yard, but it's more than just safety.  Again, we are talking about construction costs."  (Uzarski Dep. at 106.)

Richard Inclima is currently the Director of Safety and Education for the Brotherhood of Maintenance of Way Employees Division of the International Brotherhood of Teamsters ("BMWED").  (Report of Richard A. Inclima ("Inclima Rep.") at 1.)  Inclima passed the appropriate testing and training requirements to be "qualified and designated" by the carrier, in accordance with 49 C.F.R. § 213.7, to perform track inspection, institution remedial action and conduct track restoration and renewal under traffic per FRA regulation.  (*Id.*)  During his career, Inclima supervised a number of large scale track restoration projects, including the complete restoration of rail yards.  (*Id.*)  Inclima performed and supervised the construction of many structures adjacent to tracks including walkways and grade crossings.  (*Id.*)  Inclima also has fifteen years of experience with railroad regulatory matters as Director of Safety and Education for the BMWED.  (*Id.*)  In his capacity as Director, Inclima represented BMWED on the Rail Safety Advisory Committee ("RSAC") Working Group and various task forces which developed the recommendations resulting

in the 1998 revisions to the Federal Track Safety Standards, 49 C.F.R. § 213. (*Id.*) Inclima's primary opinions are that walkways are not, and would not become, part of the track structure and that the State Rule does not conflict with the Federal Rules. (*Id.* at 2.) Inclima supports these conclusions largely through his own interpretations of the Track Safety Standards and the State Rule.

A fact is genuinely in dispute when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Viewing the witness' reports, deposition testimony and supporting materials in favor of Defendants, a reasonable factfinder could conclude that the State Rule will not prevent Norfolk Southern from complying with the Federal Rules regarding ballast and roadbed – particularly, drainage and stability – in their newly constructed and re-constructed railroad yards. Additionally, a reasonable factfinder could conclude that the State Rule does not unduly limit Norfolk Southern's ability to address these safety concerns. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (summary judgment is proper when no reasonable juror could find for the nonmovant). These facts are also material since their resolution will determine if the State Rule is impliedly preempted because it conflicts with the Federal Rules. *See Patel v. Allstate Ins. Co.*, 105 F.3d 365, 370 (7th Cir. 1997) ("An issue of fact is 'material' if it is outcome determinative"). Accordingly, genuine issues of material fact exist.

The Court understands the unique posture of this case, in that it will act as the finder of fact at trial. *Accord Patton v. MFS/Sun Life Financial Distributors, Inc.*, ___ F.3d ___, 2007 WL 730577, *5 (7th Cir. 2007) ("If on a certain record a district court believes a party is entitled to summary judgment, then the same court, if required to conduct a bench trial on that same record, will probably decide the case for that same party"). Nevertheless, the Court believes it will be more appropriate to decide this case based upon a record developed at an adversarial hearing. *See Casey*

*v. Uddeholm Corp.*, 32 F.3d 1094, 1099 (7th Cir. 1994) ("[T]he district court improperly weighed evidence in this case in arriving at its decision to grant summary judgment. . . . [T]he appropriate proceedings for such fact-finding is a bench trial and not the disposition of a summary judgment motion"). At that trial, the parties should focus on the extent to which the State Rule prevents Norfolk Southern from complying with the Federal Rules. And the extent to which the State Rule frustrates that FRSA's goals of promoting safety and uniformity.

### Conclusion and Order

Because the Federal Rules do not cover the same subject matter as the State Rule – employee walkways in railroad yards – the State Rule is not expressly preempted under the FRSA. Also, genuine issues of material fact exist as to whether the State Rule conflicts with the Federal Rules. Wherefore, Plaintiff's Motion for Summary Judgment is denied.

So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date: March 30, 2007