UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NORFOLK SOUTHERN RAILWAY CO., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 06 C 0641 |
| | ) | |
| CHARLES E. BOX, *et al.* | ) | Judge Virginia M. Kendall |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

The Illinois Commerce Commission adopted a regulation requiring rail carriers to provide walkways adjacent to yard tracks constructed or reconstructed after February 15, 2005 ("the State Rule"). Plaintiff Norfolk Southern Railway Co. ("Plaintiff" or "Norfolk Southern") seeks a declaration that this regulation is preempted by regulations promulgated pursuant to the Federal Railway Safety Act ("FRSA") ("the Federal Rules"). Plaintiff also asks this Court to enjoin the State permanently from enforcing its walkway regulation.

This Court previously held that because the Federal Rules do not "cover" the same subject matter as the State Rule, the State Rule is not expressly preempted under the FRSA. Additionally, this Court found that genuine issues of material fact exist as to whether the State Rule will either make it impossible for Plaintiff to comply with federal requirements for track safety and structure or stand as an obstacle to the accomplishment of the full purposes of those requirements. To resolve these disputed issues of fact, this Court held a bench trial. Based upon the evidence and testimony presented, this Court finds that Norfolk Southern does not have a typical rail yard or yard track design. Also, this Court finds that Norfolk Southern has not proved that having walkways in the Calumet and Decatur rail yards prevents adequate drainage of the track structure. Given the

foregoing facts, this Court concludes that Norfolk Southern has not proved that the State Rule stands as an obstacle to the goals of the FRSA.

I.      **The State and Federal Rules**

The State Rule has four sections. The first section defines the Rule's scope. It provides that rail carriers must create walkways adjacent to those portions of yard tracks, constructed or reconstructed after February 15, 2005, where rail carrier employees frequently work on the ground performing switching activities. 92 Ill. Admin. Code 1546.10(a)-(b). The second section lists the general requirements for the walkways. 92 Ill. Admin. Code 1546.20. The first requirement is that the walkways be surfaced with asphalt, concrete, planking, grating, native material, crushed material, or other similar material. 92 Ill. Admin. Code 1546.20(a). When crushed material is used for the walkways, the State Rule provides that "100% of the material must be capable of passing through a 1 1/2" square sieve opening and 90-100% of the material must be capable of passing through a 1" square sieve opening." *Id.* Other requirements include that the walkways must have a reasonably uniform surface, be maintained in a safe condition without compromising track drainage, have cross slopes not exceeding 1" of elevation for each 8" of horizontal length in any direction, and be a minimum width of 2 feet and be kept reasonably free of spilled fuel oil, sand, posts, rocks, and other hazards or obstructions. 92 Ill. Admin. Code 1546.20(b)-(e). The third section repeats that the State Rule applies only to "New Yard Tracks" – those constructed or reconstructed after February 15, 2005 – and defines "frequently" for purposes of the Rule as at least 5 days per week, 1 shift per day. 92 Ill. Admin. Code 1546.110(a)-(b).

The last section addresses when walkways may be required on "Other Tracks." 92 Ill. Admin. Code 1546.120(a). The last section allows the ICC to order the construction of a walkway

on "other tracks" when "rail carrier employees who frequently work adjacent to a portion of track performing switching activities are exposed to safety hazards because of the lack of a walkway." *Id.* "Other Tracks" refer to "Old Yard Tracks" and, therefore, allows the ICC to require walkways when it identifies a specific safety hazard caused by the lack of a walkway along yard tracks constructed before February 15, 2005.

Pursuant to its delegated authority, the FRA adopted a set of "Track Safety Standards." *See* 49 C.F.R. §§ 213.1-213.241; § 213.1 ("This part prescribes minimum safety requirements for railroad track that is part of the general railroad system of transportation"). The safety standards deal with such issues as train speed (§ 213.9), track repair, maintenance and inspection (§§ 213.11, 213.231), roadbeds (§ 213.31), track geometry (§ 213.51) and track structure (§ 213.101). Plaintiff asserts that the State Rule conflicts with the federal regulations dealing with roadbed and track structure. Subpart B of the Track Safety Standards "prescribes minimum requirements for roadbed and areas immediately adjacent to roadbed." 49 C.F.R. § 213.31. Specifically, it requires that roadbeds must have adequate drainage[1] and that vegetation on railroad property must be controlled.[2]

---

[1] Each drainage or other water carrying facility under or immediately adjacent to the roadbed shall be maintained and kept free of obstruction, to accommodate expected water flow for the area concerned.
49 C.F.R. § 213.33.

[2] Vegetation on railroad property which is on or immediately adjacent to roadbed shall be controlled so that it does not--
(a) Become a fire hazard to track-carrying structures;
(b) Obstruct visibility of railroad signs and signals:
    (1) Along the right-of-way, and
    (2) At highway-rail crossings;
(c) Interfere with railroad employees performing normal trackside duties;
(d) Prevent proper functioning of signal and communication lines; or
(e) Prevent railroad employees from visually inspecting moving equipment from their normal duty stations.

Subpart D, titled Track Structure, "prescribes minimum requirements for ballast, crossties, track assembly fittings, and the physical conditions of rails." 49 C.F.R. § 213.101. With regards to ballast, the Federal Rules require that it: (i) transmit and distribute the load of the track, (ii) restrain the track, (iii) provide adequate drainage, and (iv) maintain proper track crosslevel, surface, and alinement. 49 C.F.R. § 213.103.

## II.  Findings of Fact

Construction of a yard track starts below the surface with the subgrade (sometimes called roadbed), which is the compacted earth that forms the foundation of the track structure. (Pl. Exh. 104; Trial Transcript (hereinafter, "Tr.") 108:13-15, 259:1-2 (McCracken)). A layer of subballast lays atop the subgrade. (Tr. 108:16-18 (McCracken)). The subballast is a compacted layer of very small, crushed stone. (Tr. 108:19-109:9 (McCracken)). The ballast section sits atop the subballast. (Tr. 109:10-12 (McCracken)). Ballast is made of crushed stone.[3] (Tr. 109:17-18 (McCracken)). Crossties sit in the ballast section. (Pl. Exh. 201). Crossties are beams that sit perpendicular to the rails. (Tr. 110:25-111:8) (McCracken)). Rails are fastened to the top of the crossties. (Tr. 111:1-11 (McCracken)).

The ballast section performs four functions. (Tr. 55:5-18 (Inclima), 109:19-110:22 (McCracken)). First, the ballast transmits and distributes the load to the subgrade. (Tr. 55:5-18 (Inclima), 109:19-110:22 (McCracken), 279:25-281:11 (Uzarski)). Second, the ballast restrains the track laterally, longitudinally, and vertically. (Tr. 55:5-18 (Inclima), 109:19-110:22 (McCracken)).

---

49 C.F.R. § 213.37.

[3] The witnesses use the term "ballast" in two related, but distinct, ways. Usually, the witness is referring to the section of track structure. Other times, however, the witness is referring to the crushed stone or other material used to construct the track support.

Third, the ballast provides adequate drainage of the track. (Tr. 55:5-18 (Inclima), 109:19-110:22 (McCracken)). Fourth, the ballast maintains proper track crosslevel, surface, and alignment. (Tr. 55:5-18 (Inclima), 109:19-110:22 (McCracken)). The Federal Rules require that the ballast section serve each of these functions. 49 C.F.R. § 213.103.

The compacted subballast, which sits beneath the ballast section, serves to divert water draining through the ballast section away from the subgrade and to distribute the load of passing trains. (Tr. 108:19-109:9 (McCracken)). The subgrade provides additional track stability. The moisture content must be kept very low in the subgrade to keep it from becoming muddied and shifting under the load of passing trains. (Tr. 108:24-109:2; 116:5-9 (McCracken), 288:12-291:3 (Uzarski)).

Norfolk Southern has approximately 1,000 miles of track in Illinois. (Tr. 104:5-8 (McCracken)). Approximately 350 miles of its track are in its 32 rail yards in Illinois. (Tr. 104:9-14 (McCracken)). A rail yard is made up of many yard tracks. Norfolk Southern's rail yards have anywhere from 3 to 150 yard tracks running parallel to each other. (Tr. 125:4-11 (McCracken)). Yard tracks, as opposed to mainline tracks, are where trains are broken apart into individual railcars and rearranged to form new trains. (Tr. 28:9-29:9 (Inclima)). Individual railcars are placed on different tracks depending on their destination. (*Id.*). Maintenance on the railcars is also performed in rail yards. (Tr. 132:21-133:4 (McCracken)). Mainline tracks are generally through tracks that carry trains between rail yards and other destinations at high speeds. (Tr. 28:9-17 (Inclima)). However, Norfolk Southern has some mainline tracks that run through its rail yards. (Tr. 28:9-17 (Inclima)).

Larger rail yards have underground drainage systems. (Tr. 127:8-14 (McCracken)). The

5

inlets to the drainage pipes are situated level with the subballast in between tracks. (Tr. 136:19-25 (McCracken)). When water enters the track, it must make its way through the passageways between the individual pieces of ballast – called voids in the railroad industry – to an inlet or, in a rail yard without an underground drainage system, to a drainage ditch. (Tr. 130:8-16 (McCracken), 287:5-10 (Uzarski)). When the voids become clogged, the ballast is said to have fouled. (Tr. 60:21-61:1 (Inclima), 116:17-25, 118:16-19 (McCracken)). Fouled ballast will cause structural instability and may lead to derailments. (Tr. 61:1-3 (Inclima), 116:17-25, 117:1-8 (McCracken), 288:12-289:9 (Uzarski)). The Federal Railroad Administration publishes a Track Safety Standards Compliance Manual, with commentary and "Guidance" on the various sections of the CFR Track Safety Standards. The Guidance for § 103(b) states:

> Inspectors should consider the overall condition of a track when citing fouled ballast. Because ballast conditions can be subjective in nature, Inspectors should also look to other indicators, such as a geometry condition. For example, a fouled ballast violation might be appropriate if the track has poor drainage and there is a geometry condition. The term "geometry condition"...means a track surface, gauge or alinement irregularity...due to the reduced or non-existent capability of the track structural components to hold the track into its preferred geometric position.

(Trial Exhibit ("Tr. Ex.) 105, page 5.44, NS 00378).

The amount, slope and size of the ballast are important to drainage. Excess ballast restricts drainage. (Tr. 118:1-8 (McCracken)). Ballast with a steeper slope drains better than ballast with a flatter slope. (Tr. 288:2-11 (Uzarski)). Ballast comes in sizes classified by AREMA, the American Railway Engineering and Maintenance of Way Association, the professional association for railroad engineers dealing with maintenance of the railroad right of way (track structure, design, right of way). (Tr. 196:21-197:10 (McCracken); Def. Ex. 370, NS 00292). Norfolk Southern

6

generally uses ¾-inch ballast in its rail yards. (Tr. 120:1-25, 122:8-123:18 (McCracken)). AREMA publishes a manual for railway engineering with suggested industry standards. (Tr. 197:6-10 (McCracken)). The manual indicates that Norfolk Southern's use of AREMA #5 in its rail yards is consistent with the industry standard:

> Rail yards and some industrial track gradations are generally graded from 1 inch to 3/8 inch, (AREMA No. 5 gradation, Table 1-2-2), to provide improved walkway and safety conditions along the track. The finer gradations for yard applications do not restrict track drainage as the construction practices for yard facilities provide quick runoff of ground water through the means of under track and yard drainage systems.

(Def. Ex. 370, NS 00297.). Norfolk Southern uses two-inch ballast on its mainline tracks. (Tr. 120:1-17 (McCracken)). Larger ballast has larger voids and consequently better drainage than smaller ballast. (Tr. 119:4-25 (McCracken), 287:16-288:1 (Uzarski)). Sometimes engineers respond to problematic drainage conditions by using larger ballast than would otherwise be used under normal conditions. (Tr. 122:8-123:18 (McCracken)). Though the smaller ballast may yield something in drainage capability to larger ballast, the smaller size makes it more comfortable for those walking in yards, and may reduce tripping hazards. (Def. Ex. 370, NS 00297 (citing improved walkway and safety conditions along track); Tr. 319: 8-18).

Norfolk Southern offered the testimony of Dr. Donald Uzarski ("Dr. Uzarski"), who lectures in the Railroad Engineering Program at the University of Illinois Urbana-Champaign and led the railroad engineering asset management research program at the U.S. Army Construction Engineering Research Laboratory for over twenty years before he retired in 2004. (Pl. Ex. 207; Tr. 276:18-23 (Uzarski)). Dr. Uzarski has inspected rail track and is familiar with the principles of track design and structure. (Tr. 278:4-17 (Uzarski)). Dr. Uzarski identified the many features of the track

structure and the general variables that contribute to safety issues in rail track. (Tr. 308:15-309-10 (Uzarski)). Dr. Uzarski testified about the potential problems caused by the State's walkway rule. (Tr. 299:7-303:22 (Uzarski)). Dr. Uzarski never testified that he visited any Norfolk Southern rail yard. Dr. Uzarski could not identify any literature or studies on whether walkways contribute to drainage or other track structure problems. (Tr. 313:15-314:15 (Uzarski)).

Jeffrey McCracken is the Assistant Vice President of Maintenance of Way for Norfolk Southern. (Tr. 101:2-4 (McCracken)). He has been with the company for almost 30 years. (Tr. 103:3-5 (McCracken)). Before taking his current position in April, 2007, he was in charge of maintenance of way operations for the railroad's west and north regions from 2000-2003, which would include the Chicago region, including its Calumet and Kankakee yard, and from 2003-2007 its west region, which would include the railroad's Decatur yard. (Tr. 229:2-231:7 (McCracken)). In his various positions, McCracken has visited every Norfolk Southern rail yard in Illinois. (Tr. 104:12-16 (McCracken)).

McCracken testified regarding the typical Norfolk Southern rail yard design. McCracken illustrated this design in a hand-drawn exhibit as well as through a computer-generated diagram. (Tr. 106:23; 164:9; 157:8-17 (McCracken)). According to his testimony, yard tracks in the typical rail yard are situated so that the centerline of one track is 14 feet away from the centerline of a parallel track. (Tr. 125:9-15 (McCracken)). In its rail yards, Norfolk Southern places nine inches of ballast under its crossties. (Tr. 149:18-150:3 (McCracken)). Crossties are 7 to 8 inches square and 8 ½ feet in length. (Tr. 150:15-19, 151:1-4 (McCracken)). On the ends of each crosstie, extending away from the track and level with the top of the crosstie, is six inches of ballast measured horizontally from the end of the crosstie. (Tr. 126:5-17 (McCracken)). The ballast descends at a 2:1

slope from the top of the abutment down to the subballast where there is a drain inlet or a culvert to carry water to a drainage ditch. (Tr. 125:16-126:4 (McCracken)). A 2:1 slope means that for every two inches that the ballast extends horizontally, it descends one inch. (Tr. 125:20-24 (McCracken)). Together, the six-inch ballast abutment and the sloped ballast section make up what is referred to as the shoulder ballast. (Tr. 285:17-286:12 (Uzarski)). Thus, within a typical Norfolk Southern rail yard with 14 feet between track centers of parallel tracks, there is only 4 ½ feet of space between parallel tracks in which the ballast could be manipulated. This is because 8 ½ feet of this space are taken up by the crossties themselves, and 1 foot is taken up by the 6-inch ballast abutments at the ends of each crosstie. (Tr. 126:18-23 (McCracken); *see also* Tr. 125:9-15, 126:5-17, 151:1-4 (McCracken)). This 4 ½-foot space is completely occupied by the shoulder ballast of the structures supporting the adjacent tracks, as the shoulder ballast of parallel tracks consumes the entirety of the area between tracks. (Tr. 126:18-127:7 (McCracken) (track structures in rail yards "butt against each other")). In the typical rail yard described by McCracken, there would be no room to place a walkway between the parallel tracks unless it was placed on top of the shoulder ballast.

McCracken then discussed three alternative ways in which walkways could be added and why he believed each alternative would cause rail yard safety issues. First, McCracken considered adding ballast between the tracks to create a level walking surface. (Tr. 136:2-9 (McCracken)). This was not acceptable because the added ballast would cover the inlets to the drainage system and obstruct the flow of water to ditches, restricting drainage of the track and eventually causing an unstable track. (Tr. 136:2-138:16 (McCracken)). Second, McCracken considered placing a walkway at the subballast level. This would alleviate the drainage complications caused by the first

9

scenario, but would not restrain the track laterally. (Tr. 138:17-140:23 (McCracken)). To make room for the two-foot walkway at the subballast level, the shoulder ballast coming off the six-inch abutment would have to be at a 1:1 slope. (*Id.*). This slope was insufficient to hold in place the six-inch abutment at the ends of the crossties, which is needed to restrain the track laterally. (*Id*.). Third, McCracken considered extending the six-inch abutment at the ends of the crossties to make a two-foot walkway. This option was not viable because it would create a safety hazard by requiring workers to walk too close to the train and create the drainage and track stability problems. (Tr. 140:24-142:17 (McCracken)).

On February 12, 2003, the United Transportation Union petitioned the ICC to adopt a rule mandating that walkways be placed adjacent to tracks in Illinois. (Tr. Ex. 211, NS 00008). On October 2, 2003, an ICC Administrative Law Judge held an evidentiary hearing on the Union's proposed rule. (*Id.*). The ALJ issued a proposed order on January 7, 2004, concluding that the walkway rule was "not in the best interest of railroad safety" and would result in railroad tracks "which will not conform to FRA standards for track support." (*Id.*, NS00015). The ICC never adopted or rejected the ALJ's proposed order.

The ICC offered 60 photographs taken at Norfolk Southern's Decatur and Calumet yards. (Def Exs. 301-333 (Decatur) and Def. Exs. 334-360 (Calumet)). Decatur is Northern Southern's largest rail yard in Illinois. (Tr. 182:2-11 (McCracken)). Norfolk Southern submitted three photographs of railroad tracks, at least one with a slope clearly greater than the photographs taken in the Decatur and Calumet yards. (Pl. Exs. 202-1-202-3). The only testimony regarding these photographs assumed that they represented pictures of mainline track. (Tr.73:9-17 (Inclima)). The photographs taken in the Decatur and Calumet rail yards do not show a yard track design as

10

McCracken described. The parallel tracks do not have a V-shape slope between them. Rather, the surface adjacent to and between the yard tracks, including near the switching areas, is flat. McCracken also answered questions regarding the ICC's inspection of the Kanakee rail yard for alleged violations of the walkway requirement. (Tr. Exs. 367-67; Tr. 238:20-247:8 (McCracken)). During the exchange, McCracken agreed that the Kankakee yard likely contained no V-shaped slope if it was able to comply with the State walkway rule. (Tr. 246:15-24 (McCracken)). In response, McCracken testified that the Calumet yard recently has experienced substantial drainage problems due to this configuration and Norfolk Southern is working to reconfigure the yard to eliminate the problem. (Tr. 136:2-138:16, 189:5-12, 255:24-256:23 (McCracken); Def. Exh. 334-360). The photographs do not display any drainage problems. The FRA has not cited Norfolk Southern for drainage problems at the Calumet yard. (Tr. 188:4-6 (McCracken)). And Norfolk Southern did not submit other evidence of the drainage problems or its plans to reconfigure the Calumet rail yard. Based on the evidence presented, this Court finds that Norfolk Southern does not have a typical design for its rail yards. Additionally, the design of the Calumet and Decatur yards is relatively flat, accommodates a walkway adjacent to the track and uses 3/4 inch ballast for track support. Norfolk Southern has not proved that this design creates safety issues resulting from a lack of adequate drainage.

### III. Conclusions of Law

The Supreme Clause of the United States Constitution states: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the Supreme Law of the land." U.S. Const., art. VI, cl. 2. Under the Supremacy Clause, federal law preempts state law in three circumstances: (1) when Congress explicitly defines the extent to which its statute

11

preempts state law ("express preemption"); (2) when state law attempts to regulate conduct in a field that Congress intended the federal government to occupy exclusively ("field preemption"); or (3) when state law actually conflicts with federal law ("conflict preemption"). *English v. General Elec. Co.*, 496 U.S. 72, 78-79 (1990); *Gracia v. Volvo Europa Truck, N.V.*, 112 F.3d 291, 294-295 (7th Cir. 1997). With any preemption "the ultimate touchstone" is congressional purpose. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).

### A.     Express Preemption

Section 434 of the FRSA, the statute's preemption clause, provides that a state law, regulation or order related to railroad safety may continue in force "until such time as the [FRA] has adopted a rule, regulation, order, or standard covering the subject matter of such State requirement." 49 U.S.C. § 20106; *see Shots v. CSX Transp., Inc.*, 38 F.3d 304, 307 (7th Cir. 1994) ("If the Secretary promulgates a regulation that covers the subject matter of some state safety requirement, the state requirement must give way (with an inapplicable exception) even if there is no direct conflict"). For federal regulations to "cover" the same subject matter, they must do more than "touch upon" or "relate to" the state regulation's subject matter. *Easterwood*, 507 U.S. at 665. Instead, "preemption will lie only if the federal regulations substantially subsume the subject matter of the relevant state law." *Id.*

This Court previously held that the Federal Rules do not "cover" the same subject matter as the State Rule. McCracken testified that in the typical rail yard design, the space between the yard tracks is completely occupied by the shoulder ballast of the structures supporting the adjacent tracks. Thus, any walkway would occupy the same physical space as the track structure. From this testimony, Norfolk Southern argues that the Federal Rules, practically speaking, cover the same area

as the State Rule. McCracken, however, testified that a rail yard and the yard tracks may be designed such that the walkways are adjacent to the track structure rather than occupying the same space.[4] (Tr. 136:2-142:17 (McCracken)). Indeed, the photographs of the Decatur and Calumet yards show a flat surface adjacent to, not on top of, the track structure. (Def. Exs. 301-360).

The conclusion that walkways will be placed adjacent to the roadbed and track structure leads into Norfolk Southern's more legal argument that because Subpart B "prescribes minimum requirements for roadbed and areas immediately adjacent to roadbed," the Federal Rules cover the same subject matter as the State Rule. This Court, however, cannot simply look at the titles of the Federal Rules as indicators of their preemptive scope. The general headings to Subparts B and D carry descriptive labels and do not prescribe any safety rules. *See Easterwood*, 507 U.S. at 669 (distinguishing federal regulations that are descriptive, which do not preempt state law, from those that are prescriptive, or that affirmatively require or allow certain safety measures, which preempt state law). The Federal Rules do not "cover" the entire gamut of materials, objects or activities that may occur trackside, only those subject matters addressed or considered by the FRA in setting the Federal Rules. *See Doyle*, 186 F.3d at 795 ("For preemption, the important thing is that the FRA considered a subject matter and made a decision regarding it"). Thus, the safety standards set in 49 C.F.R. § 213.103, 213.33 and 213.37 are the subject matters substantially subsumed by the Federal Rules.

**B.      Implied (Conflict) Preemption**

State law is impliedly preempted to the extent that it actually conflicts with federal law.

---

[4] The State Rule applies only to those portions of yard tracks, constructed or reconstructed after February 15, 2005, where rail carrier employees frequently work on the ground performing switching activities. 92 Ill. Admin. Code 1546.10(a)-(b); 1546.110(a)-(b).

State law conflicts with federal law "when it is impossible to comply with both state and federal law" or "where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984); *see also Freightliner Corp. v. Myrick*, 514 U.S. 280, 289 ("At best,*Cipollone* [*Liggett Group, Inc.*, 505 U.S. 504 (1992)] supports an inference that an express pre-emption clause forecloses implied preemption; it does not establish a rule"). The party advocating preemption bears the burden of proof. *Fifth Third Bank ex rel. Trust Officer v. CSX Corp.*, 415 F.3d 741, 745 (7th Cir. 2005). Thus, Norfolk Southern must "cite empirical evidence that would establish that the congressional objective at work behind the enactment of the [FRA] would either be frustrated or rendered ineffective if [Illinois] mandates [walkways next to railyard tracks]." *Frank Bros., Inc. v. Wisconsin Dept. of Transp.*, 409 F.3d 880, 894 (7th Cir. 2005). Congress passed the FRSA for the purpose of promoting rail safety and making laws, regulations and orders related to railroad safety "nationally uniform to the extent possible." 49 U.S.C. §§ 20101, 20106; *see Burlington Northern & Santa Fe Railway Co. v. Doyle*, 186 F.3d 790, 794 (7th Cir. 1999) (the FRSA "also advanced the goal of national uniformity of regulation because one of its provisions expressly preempts state laws regulating railroad safety"). Norfolk Southern argues that the State Rule frustrates the FRSA's goals of safety, uniformity and flexibility.

**1.    Safety**

Railway safety is the paramount goal of the FRSA. One component of ensuring safe railroads is the requirement in 49 C.F.R. § 213.33[5] and § 213.103 that the design and maintenance

---

[5] Each drainage or other water carrying facility under or immediately adjacent to the roadbed shall be maintained and kept free of obstruction, to accommodate expected water flow for the area concerned.

14

of the track structure and roadbed permit adequate drainage. Inadequate drainage can cause structural instability and may restrict the ballast's ability to transmit and distribute the load, restrain the track laterally, longitudinally, and vertically, and maintain proper track crosslevel, surface, and alignment. (Tr. 124:9-20, 132:1-142:17 (McCracken), 288:14-291:9 (Uzarski)). Norfolk Southern contends that the State Rule's requirements as to the type of material used to construct the walkways and that the walkway must have a 8:1 (horizontal:vertical) slope will prevent adequate drainage (and, eventually, basic track support).

The State Rule requires that when crushed material is used for the walkways, "100% of the material must be capable of passing through a 1 1/2" square sieve opening and 90-100% of the material must be capable of passing through a 1" square sieve opening." *Id.* McCracken testified that Norfolk Southern uses two-inch ballast on its mainline tracks, including those in rail yards. (Tr. 120:1-17, 122:5-7, 133:14-20 (McCracken)). He also identified specific places in or near its Decatur, Granite City, Ashland Avenue, Calumet, and Park Manor yards where two-inch ballast is used. (Tr. 122:8-123:18, 149:7-17 (McCracken)). On slope, the State Rule requires it to be no greater than one inch of elevation change for every eight inches in width of the walkway. 92 Ill. Admin. Code § 1546.20(c). Norfolk Southern Standard Procedures 20 and 390, as well as Plan 1-21, call for a 2:1 slope for ballast extending away from the ends of crossties for the type of track typically found in rail yards. (Tr. Exs. 104, 201, & 203). McCracken testified that the 2:1 slope facilitates drainage and is necessary to maintain the six-inch abutment of ballast that restrains the track laterally. (Tr. 125:16-126:4; 132:1-12 (McCracken)). Dr. Uzarski also testified about the potential drainage problems caused by the State's walkway rule. (Tr. 300:10-21 (Uzarski)).

---

49 C.F.R. § 213.33.

The Court acknowledges that McCracken and Dr. Uzarski have considerable expertise in the field of railroad design and maintenance. And absent contrary evidence, this Court readily would have accepted their opinions that the state walkway rule prevents Norfolk Southern from providing adequate drainage to its yard tracks. The other evidence presented, however, substantially undermines these opinions. McCracken described a typical Norfolk Southern rail yard wherein the yard tracks were constructed with a 2:1 slope, creating a V-formation between parallel tracks and leaving no room for a flat walkway surface. McCracken illustrated this design in a hand-drawn exhibit as well as through a computer-generated demonstration.

Norfolk Southern submitted no documentary evidence of actual rail yards designed consistent with McCracken's description. And McCracken did not identify which rail yards in Illinois were constructed using the design described. The photographs from the Calumet and Decatur rail yards, along with the compliance letters from the ICC regarding the Kankakee yard, contradict McCracken's testimony regarding a typical Norfolk Southern rail yard. These documents and photographs portray little or no slope from the tracks and considerable flat areas between the parallel yard tracks. The flat surface near the switching areas appears to be made up of the standard 3/4 inch AREMA ballast. Explaining the photographs, McCracken testified that the design in the Calumet yard is causing significant drainage problems and that Norfolk Southern is planning to reconfigure the yard. Norfolk Southern provided no evidence of drainage or track stability problems beyond McCracken's testimony – that is, no documents from the FRA, the ICC or Norfolk Southern itself. In the end, there was no documentary evidence of an actual instance where drainage problems were caused by walkways adjacent to yard tracks, or where drainage problems were caused by the design currently used at the Calumet and Decatur rail yards. Without such evidence, this Court

concludes that Norfolk Southern has not carried its burden of proving that the State Rule will frustrate the FRSA's goal of safe railroads.

**2.      Flexibility**

The Track Safety Standards are performance standards. Norfolk Southern maintains that the State Rule's mandatory material requirements, including the type of material, the slope of the material, the width of the material, and the surface condition of the material, usurp the flexibility that 49 C.F.R. § 213.103 affords railroads in configuring their trackside material. Unlike other federal performance standards, Congress did not find that more specific requirements should not be imposed because it wanted to allow railroads flexibility. For example, when adopting the requirement for automatic occupant restraints, Congress provided several alternatives by which automakers could comply with the rule:

> The final rule requires, in accordance with the phase-in schedule, that automatic occupant protection be provided in passenger cars. The requirement can be complied with through any of the occupant protection technologies discussed earlier in the preamble, if those systems meet the testing requirements of the rule; i.e., manufacturers may comply with the rule by using automatic detachable or nondetachable belts, airbags, passive interiors, or other systems that will provide the necessary level of protection.

*Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861, 896-97 (2000), quoting Federal Motor Vehicle Safety Standard; Occupant Crash Protection, 49 C.F.R. 28962, 28996. Likewise, the regulations regarding the transport of certain hazardous materials express the need for flexibility. *CSX Transp., Inc. v. Williams*, 406 F.3d 667, 671-672 (D.C. Cir. 2005), citing 68 Fed.Reg. at 14511 ("[T]he flexibility provided by a performance standard permits a company to implement a security plan that is tailored to its specific circumstances and operations."); *id.* at 14,514 ("There is no 'one-size-fits-all' security plan that will be appropriate for each company's individual **336 *672

17

circumstances."); *id.* at 14,515 ("We continue to believe that, if it is to be effective, a regulation mandating development and implementation of a security plan must provide sufficient flexibility so that a shipper or carrier can adapt its requirements to individual circumstances."). Neither the Track Safety Standards nor the FRSA itself contain similar expressions concerning a goal of allowing flexibility in railroad design and construction. Therefore, a state regulation affords sufficient flexibility where, as here, the State Rule does not stand as an obstacle to compliance with the federal safety standards. *See Freightliner Corp. v. Myrick*, 514 U.S. 280, 289-290 (1995); *Gracia v. Volvo Europa Truck, N.V.*, 112 F.3d 291, 296 (7th Cir. 1997).

**3.    Uniformity**

The FRA provides that railroad safety standards shall be "nationally uniform to the extent possible." 49 U.S.C. § 20106. In the same section, the FRA permits states to regulate in either of two circumstances: (1) when there is no federal regulation "covering" the subject matter, or (2) when it is necessary to eliminate or reduce an essentially local safety hazard. *See Easterwood*, 507 U.S. at 665 ("The term 'covering' is in turn employed within a provision that displays considerable solicitude for state law in that its express pre-emption clause is both prefaced and succeeded by express saving clauses"). Congress thus contemplated State regulation of railroads and set a standard for uniformity expressly. The State Rule falls within the exception in § 20106 because there is no federal regulation covering its subject matter. This Court sees no compelling reason to expand the scope of Congress' uniformity provision to prevent the State walkway rule. *See Freightliner Corp. v. Myrick*, 514 U.S. 280, 289 ("At best, *Cipollone* [*Liggett Group, Inc.*, 505 U.S. 504 (1992)] supports an inference that an express pre-emption clause forecloses implied preemption; it does not establish a rule").

**Conclusion and Order**

This Court concludes that Norfolk Southern has not proved that the State Rule stands as an obstacle to the goals of the FRSA and therefore is not pre-empted.

So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date: December 17, 2007